IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL R. EVERHART and KARMELLA
FRANIC EVERHART, Individually and as
Next Friends and Natural Parents of
CHARLES MICHAEL EVERHART, a Minor,

        Plaintiffs,

      vs.                       No.    CIV-06-0654 MCA/DJS

THE CHILDREN'S HOSPITAL, CENTURA HEALTH
d/b/a ST. ANTHONY HOSPITAL and
FLIGHT FOR LIFE, ELIZABETH H. THILO, M.D.,
PATTI J. THUREEN, M.D., JOHN DOE, M.D.,
MARY ROE, M.D., JANE DOE, R.N., and
JANE ROE, R.N.,

        Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

     **THIS MATTER** comes before the Court on *Defendants The Children's Hospital's and Centura Health d/b/a/ St. Anthony Hospital and Flight for Life's Motion to Dismiss for Lack of Personal Jurisdiction or in the Alternative, Motion to Transfer Venue for Lack of Jurisdiction* [Doc. 36], filed July 9, 2007. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the motion in part and denies it in part.

**I. BACKGROUND**

     The relevant facts in this matter are largely uncontested but where a dispute exists, the Court resolves it in favor of Plaintiffs.   See <u>Wenz v. Memery Crystal</u>, 55 F.3d 1503, 1505

(10th Cir. 1995).[1]

Plaintiffs Michael R. Everhart and Karmella Franic Everhart are the parents of Charles Michael Everhart ("Charles"), a minor.  The Everhart family currently resides in Ohio.  However, at the time of Charles's birth (and when they brought this action), Michael and Karmella Everhart were citizens of New Mexico. [Doc. 39 at 14].

Charles was born August 20, 2004 at the University of New Mexico Health Sciences Center ("UNMHSC") in Albuquerque.  Charles was born prematurely, at just over 33 weeks, and X-rays taken shortly after his birth revealed that he might be suffering from hyaline membrane disease, a possibly fatal respiratory disease. [Doc. 39 at 1-2].  Because there was no bed available for Charles in the neonatal intensive care unit of the UNMHSC, arrangements were made to transport him by air ambulance to The Children's Hospital in Denver. [Id. at 2].  Indeed Michael Everhart testified through his deposition that, having been given the choice of Phoenix or Denver, the Everharts "picked Denver based on distance." [Doc. 40; Exh. D, July 19, 2007 depo. of Michael Everhart at 84].  Accordingly, arrangements were made for the air ambulance company known as Flight for Life[2] to

_____

[1]  Where the Court's jurisdiction is contested, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits[, and i]f the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor." Wenz, 55 F.3d at 1505 (internal citations omitted); see also Dudnikov v. Chalk & Vermilion Fine Arts, Inc., --- F.3d ----, 2008 WL 217724, at *3 (10th Cir. 2008) ("[A]ll well-pled (that is, plausible, non-conclusory, and non-speculative) facts alleged in plaintiffs' complaint" taken as true where personal jurisdiction is challenged.).

[2]  According to Plaintiffs, "Defendant Flight for Life is an entity owned and operated by St. Anthony Hospital in Centennial, Colorado, which in turn is owned and operated by Defendant Centura Health." [Doc. 39 at 2].  According to Defendants, however, "Flight for Life is not a separate legal entity, but is a registered trade name of Catholic Health Initiatives

transport Charles from Albuquerque to Denver, where he was to be admitted to The Children's Hospital. [Doc. 39 at 2].

Before the air ambulance left Albuquerque, Flight for Life employee and registered nurse Karen Steur made two unsuccessful attempts to intubate Charles with a size 3.5 endotracheal tube. Charles was successfully intubated on the third try by Tiffany Garcia, an employee of The Children's Hospital. [Doc. 39 at 2]. The intubation (and the Everhart parents' observation of it) is the primary allegedly tortious act[3] giving rise to the *Complaint for Medical Negligence*. [Doc. 1; Exh. 1]. Indeed, according to the Everharts,

> Charles weighed 1,798 grams when he was intubated. An infant weighing under 2,000 grams should not be intubated with anything larger than a 2.5 to a 3.0 endotracheal tube. Flight for Life's own protocol called for an endotracheal tube of 3.0 or smaller. Other tubes ranging in size from 2.5 to 4.0 were available on the flight but were not used. The use of the improperly sized endotracheal tube is the primary allegation of negligence in this case. It also is undisputed that this act took place within the state of New Mexico.

[Doc. 39 at 2].

_____

Colorado ("CHIC"). Centura Health is a not-for-profit Colorado corporation which manages CHIC-owned Colorado hospitals and clinics [but] Centura Health / St. Anthony Hospital are not the owners of Flight for Life." [Doc. 40 at 1 n.1]. To be sure, Catholic Health Initiatives Colorado has referred to itself as a defendant in motions it has filed seeking the withdrawal of counsel and the *pro hac vice* admission of substitute counsel. [See Docs. 113, 114]. For simplicity, these defendants (*i.e.*, the non-Children's Hospital defendants) will be referred to as Flight for Life, as these defendants themselves suggested in their reply to Plaintiffs' response to the motion to dismiss. [See Doc. 40 at 1 n.1].

   [3] The Everharts maintain, however, that the alleged negligence continued once Charles was admitted to The Children's Hospital. [See Doc. 1; Exh. 1 at 4-6].

3

The Everharts contend that once Charles was intubated, neither Nurse Steur nor Ms. Garcia checked for air leaks from the tube, which would have established whether it was too tight. [Doc. 39 at 2-3]. As a result of the use of the too-large endotracheal tube, allege the Everharts, Charles developed a condition known as subglottic stenosis, which has required multiple surgeries and hospitalizations and also has permanently injured and debilitated him. [See Doc. 1; Exh. 1 at 2]. They further contend that this alleged medical negligence continued after Charles was admitted to The Children's Hospital, where nurses and physicians failed to remove the tube in a timely manner. [See id.; Exh. 1 at 5].

On June 7, 2006, the Everharts filed their *Complaint for Medical Negligence* in the Second Judicial District Court, County of Bernalillo, State of New Mexico. Defendants removed the matter to this Court pursuant to 28 U.S.C. § 1332. [Doc. 1]. They now move to dismiss the *Complaint* for lack of personal jurisdiction or, in the alternative, to transfer venue to the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1631. The crux of Defendants' argument is that they lack minimum contacts with the State of New Mexico and that for this Court to exercise personal jurisdiction over them would not be consistent with due process. [See generally Doc. 36].

## II. ANALYSIS

### A. Motion to Dismiss for Lack of Personal Jurisdiction

#### 1. Establishing Personal Jurisdiction Over Non-Resident Defendants

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, a defendant may move to dismiss claims against it for lack of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). Where,

4

as here, the Court's jurisdiction is contested, the plaintiff bears the burden of proving its

existence.  <u>AST Sports Sci., Inc. v. CLF Distrib. Ltd.</u>, --- F.3d ----, 2008 WL 217722, at *2

(10th Cir. 2008).  As the Tenth Circuit has explained,

> [t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant. Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing. The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.

<u>Kennedy v. Freeman</u>, 919 F.2d 126, 128 (10th Cir. 1990) (<i>quoting</i> <u>Behagen v. Amateur</u>

<u>Basketball Ass'n of the United States</u>, 744 F.2d 731, 733 (10th Cir.1984)).  In other words,

"in the preliminary stages of litigation, the plaintiff's burden is light."  <u>Doe v. Nat'l Med.</u>

<u>Servs.</u>, 974 F.2d 143, 145 (10th Cir.1992).

The starting point for this Court's personal-jurisdiction analysis is New Mexico's

long-arm statute.  <u>See</u> <u>Pro Axess, Inc. v. Orlux Distrib., Inc.</u>, 428 F.3d 1270, 1276 (10th Cir.

2005) ("To obtain personal jurisdiction over a nonresident defendant in a diversity action,

a plaintiff must show that jurisdiction is legitimate under the laws of the forum state. . . .").

This is because the Court will have authority to assert personal jurisdiction over non-resident

defendants if the conduct complained of meets the following three-part test: (1) the

defendants must have done at least one of the acts enumerated in the long-arm statute, (2) the

cause or causes of action must have arisen from the act or acts, and (3) the defendants must

have had minimum contacts with New Mexico sufficient to satisfy constitutional due process. Cronin v. Sierra Med. Ctr., 129 N.M. 521, 525 (N.M.App. 2000).

The New Mexico long-arm statute provides, in pertinent part, that

> [a]ny person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from . . . the transaction of any business within this state [or] the commission of a tortious act within this state. . . .

N.M. STAT. ANN. § 38-1-16(A)(1) and (3) (1978).  Defendants do not contest that the first two elements of the three-part Cronin test have been satisfied, as the Everharts allege that an enumerated act occurred in New Mexico (*i.e.*, the alleged negligent intubation of Charles), and the causes of action set forth in the *Complaint* arise from this act.  [Doc. 36 at 7 ("Defendants concede that the requirements of the New Mexico long-arm statute are met, as Plaintiffs have alleged that employees of The Children's Hospital and Flight for Life committed tortious acts in New Mexico and Plaintiffs' claims arise from these acts.")].  Defendants insist, however, that they lack minimum contacts with the State of New Mexico sufficient to satisfy due process. [See generally Docs. 36, 40, 41].

### 2. Due Process

The Due Process Clause of the Fourteenth Amendment to the United States Constitution "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-472 (1985) (*quoting* Int'l

Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)). By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," Shaffer v. Heitner, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment), the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Thus, the due process analysis is a two-part one, with the Court asking, first, "whether the nonresident defendant has 'minimum contacts' with the forum state such 'that he should reasonably anticipate being haled into court there.'" AST Sports Sci., 2008 WL 217722, at * 2 (quoting World-Wide Volkswagen, 444 U.S. at 297). If sufficient minimum contacts exist, the Court "must then consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.' " AST Sports Sci., 2008 WL 217722, at * 2 (quoting Asahi Metal Indus. Co. v. Super. Ct., 480 U.S. 102, 113 (1987)).

### a. Minimum Contacts

In the tort context, courts "often ask whether the nonresident defendant 'purposefully directed' its activities at the forum state. . . ." Dudnikov, 2008 WL 217724, at *4.[4] This "'purposeful direction' doctrine [aims] to ensure that an out-of-state defendant is not bound

---

[4] By contrast, in the contract context, the question normally posed is "whether the defendant '*purposefully availed*' itself of the privilege of conducting activities or consummating a transaction in the forum state." Dudnikov, 2008 WL 217724, at * 4 (emphasis added); see also Hanson v. Denckla, 357 U.S. 235, 253 (1958).

to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." Id. (*quoting* Burger King, 471 U.S. at 475).  In that sense, the "purposeful direction" doctrine is a close relative of the doctrine of foreseeability. And while "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause . . . foreseeability is not 'wholly irrelevant.'" TH Agric. & Nutrition, LLC v. Ace European Group Ltd., 488 F.3d 1282, 1289-90 (10th Cir. 2007) (*quoting* World-Wide Volkswagen, 444 U.S. at 295, 297).[5]  In short, "if the defendant has purposefully directed his activities at residents of the forum, *and* the litigation results from alleged injuries that arise out of or relate to those activities[,]" the "minimum contacts" standard is met and the Court may, consistent with due process, assert specific[6] jurisdiction over that defendant.  Burger King, 471 U.S. at 472 (emphasis added).

### b. Traditional Notions of Fair Play and Substantial Justice

If a plaintiff clears the "minimum contacts" hurdle, the Court must still determine whether the assertion of personal jurisdiction over the non-resident defendant "would comport with 'fair play and substantial justice.' " Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1359 (10th Cir.1990) (*quoting* Burger King, 471 U.S. at 476).  This determination is, in

---

[5]  Indeed, "[f]oreseeability that an event may occur over which a defendant has no control is distinct from foreseeability of litigation based on the defendant's own actions." TH Agric. & Nutrition, 488 F.3d at 1290.

[6]  Jurisdiction may either be general or specific. "General jurisdiction arises from a defendant's continuous and systematic activity in the forum state." Kennedy, 919 F.2d at 128 n.2.  Specific jurisdiction arises in the absence of such continuous and systematic activity and "is predicated on a defendant's minimum contacts with the forum which give rise to the cause of action." Id.  A specific-jurisdiction analysis is appropriate in this case.

effect, one of the reasonableness of asserting jurisdiction given the circumstances surrounding the case. Factors that the Court considers in making this determination include the following:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

Trujillo v. Williams, 465 F.3d 1210, 1221 (10th Cir. 2006) (*quoting* Pro Axess, Inc., 428 F.3d at 1279-80). It is significant, as will become clearer later in this *Opinion*, that

> an interplay exists between the two components [of minimum contacts and reasonableness], such that, "depending on the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." The First Circuit has aptly described this interplay as follows:
>
> "We think . . . that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts]."

OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1092 (10th Cir. 1998) (*quoting* Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir.1994)). With these concepts in mind, the Court now turns to the facts of the matter before it.

### 3. The Assertion of Personal Jurisdiction over Flight for Life

Flight for Life contends that its single contact with the State of New Mexico was an isolated act that came about solely because the Everharts made a "unilateral request" to have Charles transported to Denver for care he could not receive in Albuquerque. [See Doc. 36 at 5 ("Plaintiffs' [sic] seek to subject . . . Flight for Life to suit in a New Mexico [court] solely because it responded to their solicitation for help and assisted with the transport of Charles Everhart to Denver, Colorado.") (emphasis in original); see also Doc. 40 at 2, 3]. According to Flight for Life, it did not initiate any contact with New Mexico, nor did it purposefully avail itself of the privilege of conducting business within the state. Flight for Life denies that it could have foreseen that its agreement to transport Charles might have an impact in New Mexico, and further maintains that minimum contacts are lacking because it does not (1) own or lease property; (2) employ anyone; (3) require its employees to be licensed; or (4) have a registered agent in New Mexico. [Doc. 36 at 9].

As this case arises in the context of alleged medical malpractice, Flight for Life has directed the Court to a number of cases wherein New Mexico courts "have repeatedly found that out-of-state health care providers, even those with some presence in New Mexico, do not have the minimum contacts necessary to fall under the State's personal jurisdiction." [Doc. 40 at 4].

In Tarango v. Pastrana, a patient/resident of New Mexico traveled to Texas for a tubal ligation. She sued the Texas surgeons, as well as the hospital where the surgery was performed, in New Mexico after she returned home and discovered that she had become

10

pregnant.  The New Mexico Court of Appeals held that the surgeons[7] lacked minimum contacts with New Mexico sufficient to satisfy due process because (1) they never conducted activities within New Mexico, and (2) the sole basis for the attempted assertion of personal jurisdiction over them surgeons was patient's "unilateral activity ( . . . medical treatment) in Texas."  Tarango v. Pastrana, 94 N.M. 727, 730 (N.M.App. 1980).  Quoting from Hanson v. Denckla, the court stressed that "[t]he unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State [although t]he application of that rule will vary with the quality and nature of the defendant's activity. . . ."  Id. at 728 (quoting Hanson, 357 U.S. at 253).

In Cronin v. Sierra Medical Center, a New Mexico resident/patient similarly traveled to Texas, where he underwent heart bypass surgery.  Although the surgery itself was successful, patient later developed complications that he believed were caused by his physicians' failure to monitor his post-surgical, follow-up antibiotic therapy.  Patient thereafter brought a malpractice action in New Mexico against the physicians and the hospital where the surgery was performed.  Cronin v. Sierra Med. Ctr., 129 N.M. 521 (N.M. App. 2000).

The New Mexico Court of Appeals again held that the physicians lacked minimum contacts with the State of New Mexico, finding it "determinative that . . . Defendants acted in New Mexico only after Patient had unilaterally initiated a doctor-patient relationship in

---

[7] The hospital similarly was deemed to lack minimum contacts with New Mexico.  See Tarango, 94 N.M. 727.

11

Texas[, which] type of action does not constitute purposeful action." <u>Cronin</u>, 129 N.M. at

852.  The court explained:

> When a person unilaterally seeks specialty care, which Patient
> no doubt did by traveling to Texas to undergo heart bypass
> surgery and then again to receive treatment for his staph
> infection, follow-up care, including medical prescriptions, are
> almost sure to follow. This type of follow-up care, without any
> evidence that the non-resident physician reached into the forum
> state in order to attract the patient's business, simply does not
> constitute the purposeful availment that is both contemplated in
> and required by our due process analysis.

<u>Id.</u>

Both <u>Tarango</u> and <u>Cronin</u> cited extensively from <u>Gelineau v. New York University</u>

<u>Hospital</u>, a case involving a New Jersey resident's medical malpractice suit against a New

York hospital to which he had traveled for treatment of an aneurysm.  In the course of

treatment, patient received blood transfusions and, after later being diagnosed with infectious

hepatitis, brought suit against the hospital.  Noting the "fundamental[] unfair[ness in]

permit[ting] a suit in whatever distant jurisdiction the patient may carry the consequences of

his treatment," the District Court for the District of New Jersey explained, in pertinent part,

that the case before it did

> not involve a product which was deliberately or foreseeably
> shipped into the forum state's markets. It focuse[d] on a service,
> not performed in the forum state but in a foreign state, rendered
> after the plaintiff voluntarily traveled to the foreing [sic] state so
> that he could benefit from that service which was available there
> only.
>
> When one seeks out services which are personal in nature, such
> as those rendered by attorneys, physicians, dentists, hospitals or

> accountants, and travels to the locality where he knows the services will actually be rendered, he must realize that the services are not directed to impact on any particular place, but are directed to the needy person himself.

Gelineau v. New York Univ. Hosp., 375 F.Supp. 661, 667 (D.N.J. 1974).

Finally, in Valley Wide Health Services, Inc. v. Graham, patient/decedent's father, a resident of New Mexico, brought a wrongful death action in New Mexico against a Colorado physician whose only contact with the State of New Mexico came about when he returned a telephone call to father's residence there. Father had called and left a message for the physician—who two days earlier had seen patient in his Colorado clinic and determined she had a virus—informing the physician that patient was running a high fever and had begun vomiting. The physician told father that the virus was running its course. The next day, patient died from peritonitis, secondary to pneumonia. Valley Wide Health Servs., Inc. v. Graham, 106 N.M. 71 (1987).

While recognizing that "in some cases a single act performed within New Mexico can be a sufficient minimum contact to subject a defendant to personal jurisdiction" therein, the New Mexico Supreme Court nonetheless held that the physician

> did not "purposefully initiate" activity in the state, "thus invoking the benefits and protections" of New Mexico laws. He did return [father's] telephone call to a telephone number in New Mexico, but only after a doctor-patient relationship had been established in Colorado, and after [father] had left a message and request with the doctor's answering service. This single telephone call lacks the purposefulness of defendant's contact which is demanded by due process.

13

Valley Wide Health, 106 N.M. at 72.

Importantly, in not one of these cases—Tarango, Cronin, Valley Wide Health, or Gelineau—did the alleged tortfeasor actually travel to and enter the State of New Mexico, which makes sense when one considers that the essence of the services provided by each defendant in those cases was the provision of health care at the particular defendant's own place of business. A significant and critical difference between the cited cases and the facts of the instant matter, though—at least as pertains to Flight for Life—is that the essence of Flight for Life's work is mobility and the ability and willingness to respond to a medical emergency by traveling to the patient.

Unlike the health care providers in the cited cases, Flight for Life physically flew an air ambulance from Colorado to Albuquerque, consistent with its overall mission of providing mobile medical care and transport, for the purpose of having its medical team fly Charles Everhart back to Denver for admission to The Children's Hospital. The heart of Flight for Life's business is trauma transportation in the company of trained medical personnel, as is evident from its web site, which states, in part: *"We provide trauma transport across several states' highways and skyways. . . . Staffed with highly trained nurses, paramedics and respiratory therapists, Flight for Life is able to handle all patients in need of air medical transport. . . ."* [Doc. 39; Exh. 1 at 1]. As an emergency air ambulance service, Flight for Life's charge is to respond when called. While Flight For Life's actions in caring for and flying Charles to Denver may have been incidental to Charles's ultimate admission to and treatment at The Children's Hospital, those actions

cannot be said to have been incidental or ancillary to the primary function served by Flight for Life itself. In this regard, the Court finds both DeVenzeio v. Rucker, Clarkson & McCashin and Russey v. Rankin instructive.

In DeVenzeio, the New Mexico Court of Appeals held that the fact that a California attorney made allegedly deceitful and fraudulent misrepresentations in letters sent and telephone calls made to clients in New Mexico was insufficient to create minimum contacts between the attorney and the State of New Mexico, such that a New Mexico court could rightfully assert personal jurisdiction over him. According to clients, the attorney was "subject to New Mexico courts because he perpetrated the intentional torts of fraud, deceit, and misrepresentation in his communications through the letters and telephone calls[]" and therefore actually committed the allegedly tortious acts in New Mexico. DeVenzeio v. Rucker, Clarkson & McCashin, 121 N.M. 807, 810 (N.M.App. 1996). What was significant to the court of appeals, however, was the *primary function* the attorney was meant to serve. The court explained:

> Rucker's primary service to the DeVenzeios was to provide legal services in California on their behalf. These legal services were limited to pursuing rights and claims in California. Rucker's letters and telephone calls to the DeVenzeios in New Mexico were ancillary to this primary function.
> . . .
> Rucker's only contacts with New Mexico were telephone calls and letters, incidents of his representation of New Mexico residents in matters pending in California and Arizona. Under these circumstances, Rucker's communications with the DeVenzeios in New Mexico did not rise to the level of a purposeful availment of opportunities in New Mexico.

Id. at 726, 727.  A different outcome from the application of this "primary function" test distinguishes DeVenzeio from Russey.

In Russey, a New Mexico consumer sued a California debt collection agency, alleging that demand letters sent to him in Albuquerque violated the Fair Debt Collection Practices Act and the New Mexico Unfair Practices Act.  The collection agency moved to dismiss for lack of personal jurisdiction.  Denying the motion, the court distinguished those situations in which the allegedly injurious communications "were merely means of conducting some other primary business" from those in which "communications in the forum state constitute[d] the heart of [the] defendant's business and [were] the precise subject matter of" the litigation.  Russey v. Rankin, 837 F.Supp. 1103, 1105 (D.N.M. 1993) (quoting Bailey v. Clegg, Brush & Assoc., Inc., 1991 WL 143461 (N.D.Ga.1991)).  With respect to the California collection agency before it, the court concluded that because its written correspondence was "the nucleus of the alleged wrongful conduct rather than just an ancillary contact with the forum, it was reasonable [for defendant] to have anticipated being hailed into New Mexico court on claims based upon the letter."  Russey, 837 F.Supp. at 1105.

So too in this case.  Rather than being ancillary to some other purpose, caring for and transporting Charles from Albuquerque to Denver by air ambulance was the primary function Flight for Life was to serve for him and his family. As already explained, mobility is the essence of Flight for Life's business, and responding to medical emergencies with the ability to take custody of and transport a patient is what it does.  That "Flight for Life . . . only rarely

provide[s] flight transport services for New Mexico residents, and only when specifically contacted by New Mexico health care providers or families who request transport to Colorado" [see Doc. 40; Exh. E, "Affidavit of Kathleen Mayer"] does not, in the view of the Court, alter the fact that Flight for Life is prepared to be so summoned and, in fact, expects to be.  To be sure, Flight for Life's web site specifically states, under the caption "Where We Serve," that "[t]he eight-state region served by Flight for Life includes more than 200 communities in Colorado, as well as western Kansas and Nebraska, Montana, *New Mexico*, South Dakota and Wyoming." [Doc. 39; Exh. 1 at 2 (emphasis added)].  Given that Flight for Life specifically services New Mexico, Flight for Life should have foreseen that the commission of a tortious act within the state might subject it to liability here.  See Russey, 837 F.Supp. at 1105.

Nor is the Court persuaded by Flight for Life's argument that it did not purposefully direct its activities toward New Mexico but, instead, was unilaterally sought out by the Everharts (or representatives of the UNMHSC). [See Doc. 36 at 5-6; Doc. 40 at 2, 3, 5]. While it is true that the Everharts affirmatively chose Flight for Life, they did so after having been informed that Charles needed to be transferred to another facility and that their options were Phoenix and Denver.  [See Doc. 40; Exh. D; M. Everhart depo. at 84 (after being told they had a choice between transporting Charles to Phoenix or Denver, the Everharts "picked Denver based on distance.")].  Moreover, the sort of "unilateral" decision the Everharts were forced to make—*i.e.,* to transport an hours-old, premature baby with a potentially fatal respiratory disease to an out-of-state neonatal intensive care unit ("NICU") because the

17

NICU at the hospital where the child was born could not accommodate him—is in no way the equivalent of the unilateral decisions made by the adult patients in <u>Tarango</u>, <u>Cronin</u>, and <u>Gelineau</u>.  There is no evidence in the record that the Everharts independently researched possible air ambulance companies that might be able to transport Charles; to the contrary, two options were presented to them.  The fact that the Everharts were even in a position to choose Flight for Life reasonably suggests that, even before they "reach[ed] out . . . to have Charles' care provided in Colorado[,]" [<u>see</u> Doc. 40 at 5] Flight for Life made itself available to provide the needed transportation services.

 Finally, Flight for Life makes an effort to downplay the significance of its web site:

> Plaintiffs attached Exhibit 1, a 2006 website page to their [Response] which discusses services provided by FFL. Presumably, this was attached to demonstrate that FFL does go out of state to transport patients.  Conspicuously absent from their [Response], however, is any assertion that this web page was ever seen by the Everharts, or played any part in inducing the Defendants' contact with New Mexico. There has also been no evidence introduced by Plaintiffs that FFL and/or TCH regularly transact business in New Mexico, or generally advertise in New Mexico, or otherwise induce New Mexico residents to use their services. This web page is not general advertising, is informational only, and comes up only if a person actively searches for the information. It also does not alter the fact that FFL goes to New Mexico only in response to a request by a New Mexico provider or family who initiates the contact.

[Doc. 40 at 8 n.10].  If nothing else, the fact that the Flight for Life web site expressly confirms that the multi-state region it serves includes New Mexico evinces Flight for Life's willingness and ability to provide trauma transport services for residents of New Mexico. In light of Flight for Life's express readiness to serve New Mexico residents in need, it

should not now be heard to say that it could not have foreseen the possibility of being haled into a New Mexico court as a result of the commission of an allegedly tortious act within the state.[8]  See Russey, 837 F.Supp. at 1205.  The Court determines that Flight for Life's contacts with New Mexico are sufficient to allow the assertion of specific jurisdiction over it.

The Court must now ask whether the assertion of personal jurisdiction over Flight for Life comports with fair play and substantial justice.  This is a close call, and while the Court cannot say that it would be unfair or unjust to make Flight for Life defend this action in New Mexico *if Flight for Life were the only defendant contesting personal jurisdiction here*, the Court believes that, under the circumstances and for the reasons set forth more fully below, it would be more sensical and efficient to litigate this matter in Colorado.  The Court analyzes the relevant factors below.

Flight for Life argues that it would "face substantial economic and logistical burdens in litigating in New Mexico."  [Doc. 36 at 18].  It asserts that (1) "[e]xercising jurisdiction is inconsistent with the mandate of the United States Supreme Court that out of state defendants have 'fair warning that a particular activity may subject [them] to the jurisdiction

---

[8]  The Court is not saying, nor does it mean to suggest, that the mere existence of Flight for Life's web site, in and of itself, is sufficient to create minimum contacts with the State of New Mexico.  See NTS AM. JUR. 2d *Computers and the Internet* §§ 24, 25 (discussing use of Internet as conferring jurisdiction over nonresidents; explaining "active," "passive," and "transactional" websites; and collecting, comparing, and contrasting cases).  Rather, the Court views the information included on the site as one factor to counter Flight for Life's insistence that, but for the Everharts' unilateral request, it would not have been in New Mexico.  That information serves as evidence of Flight for Life's willingness and ability to respond to medical emergencies in New Mexico.  The existence of the web site, therefore, supports the determination that being haled into court here should not have come as a complete surprise to Flight for Life.

of a foreign sovereign[;]'" (2) Flight for Life is not engaged in interstate commerce; and (3) Flight for Life is "not accustomed to litigating in foreign forums to which they have responded to a plea for emergent medical care from a state facility seeking help with a patient who could not be accommodate there."  [Id.].

"While not dispositive, the burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." OMI Holdings, Inc., 149 F.3d at 1096.  Obviously, in a diversity action, at least one side will be somewhat more burdened than the other in having to travel to a foreign forum.  See Hall v. Nelson Aircraft Sales, Inc., 2006 WL 624907, at *7 (E.D.Cal. Mar. 9, 2006) (noting presumptive inconvenience for party made to "litigat[e] away from its home court.").  Given the particular circumstances here, however, the Court is not persuaded that Flight for Life would be significantly burdened by litigation in New Mexico.  First, the Court has already rejected the argument that Flight for Life could not have foreseen the possibility of being made to defend an action in a state it expressly services by going to and entering that state. Next, the Court does not see any particular difficulty in having Flight for Life, the essence of whose business is mobility, travel from Denver to Albuquerque to defend this action.  That mobility, combined with the fact that travel from the two points in question is rather routine, distinguishes this case from others in which, for example, it was deemed unreasonable to force representatives of a Mexican shipyard to defend an action in Alaska, see Ins. Co. of N. Am. v. Marina Salina Cruz, 649 F.2d 1266, 1271-72, or where it was similarly deemed

20

unreasonable to compel a Canadian corporation with limited contacts with the State of
Kansas to litigate an insurance matter in that state, see OMI Holdings, 149 F.3d at 1096.
Notwithstanding that the burden on Flight for Life of litigating in New Mexico is a primary
concern, it bears noting that well before 2008, the Supreme Court had already determined
that "'modern transportation and communication have made it much less burdensome for a
party sued to defend himself in a State where he engages in economic activity.'" Pro Axcess,
Inc., 428 F.3d at 1280 (quoting Burger King, 471 U.S. at 474).[9]  For these reasons, the Court
does not believe that litigating this matter in New Mexico would impose a disproportionate
burden on Flight for Life.

      With respect to the next factor, the forum state's interest in adjudicating the dispute,

---

    [9] Burger King, in turn, was quoting from McGee v. International Life Ins. Co., a 1957
case in which the Supreme Court, seeing a "clearly discernible" trend toward "expanding the
permissible scope of state jurisdiction over foreign corporations and other nonresidents"
explained:

> Today many commercial transactions touch two or more States
> and may involve parties separated by the full continent. With this
> increasing nationalization of commerce has come a great increase
> in the amount of business conducted by mail across state lines. At
> the same time modern transportation and communication have
> made it much less burdensome for a party sued to defend himself
> in a State where he engages in economic activity.

McGee v. International Life Ins. Co., 355 U.S. 220, 222-223 (1957).  Half a century later, the
availability of not just the telephone but also e-mail, facsimiles, and videoconferencing (to name
just a few modern communications conveniences) should certainly be taken into account in
assessing the burden faced by an out-of-state defendant.  See, e.g., World Paper Res., Inc. v.
Buckeye Cellulose Corp., 1998 WL 928393, at *8 (D.Kan. Oct. 6, 1998) ("The court notes that
in this modern age of technology, where many court appearances may take place over the
telephone . . ., the burden of litigation imposed upon nonresidents is greatly decreased.").

it is evident that "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." OMI Holdings, Inc., 149 F.3d at 1096. Flight for Life maintains that New Mexico has little interest in adjudicating the Everharts' dispute because, among other things, "all the health care at issue, *except the intubation prior to transport*, was rendered in Colorado by Colorado health care providers acting pursuant to their Colorado licensure. . . ." [Doc. 36 (emphasis added)]. However, it is precisely Charles's intubation, which admittedly occurred in New Mexico, that serves as the primary allegedly tortious act giving rise to this action. [See Doc. 39 at 2 ("The use of the improperly sized endotracheal tube is the primary allegation of negligence in this case. It also is undisputed that this act took place within the state of New Mexico."). Additionally, while the Everhart family no longer resides in New Mexico (the Everharts currently live in Ohio), the Everharts represent that they moved to Ohio "in order to obtain medical services not available to them in New Mexico [and i]t is their hope to return to New Mexico when they can." [Id. at 14]. Thus, while it is true, as Flight for Life contends, that "Colorado has a substantial interest in overseeing suits against their licensed health care providers[,]" New Mexico has an equally substantial interest in ensuring that out-of-state entities that expressly make themselves available to render medical care within the state be held accountable here when they act in an allegedly tortious manner.

As for the third and fifth factors in the fair-play-and-substantial-justice analysis—the Everharts' interest in receiving convenient and effective relief and the shared interest of

Colorado and New Mexico in furthering fundamental social policies—the Court concludes that neither factor weighs particularly heavily in favor of (or against) either the Everharts or Flight for Life.  The Everharts contend that factor (3) weighs in their favor because they

> were citizens of New Mexico both when Charles was born and later when they brought this action. [The Everharts] are currently residing in Ohio in order to obtain medical services not available to them in New Mexico. It is their hope to return to New Mexico when they can. Charles' treating physicians at the time of the tor[t] were in New Mexico.

[Doc. 39 at 14].  The Court is unpersuaded that the Everharts have demonstrated that they can achieve the most efficient and convenient relief in New Mexico.

The Tenth Circuit has held that "[t]his [third] factor may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in a another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." OMI Holdings, Inc., 149 F.3d at 1097. Such was the case in Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc., where the plaintiff was "a small local company with limited resources, whose involvement in the underlying events ha[d] been totally involuntary." Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc., 205 F.3d 1244, 1249 (10th Cir. 2000).  However, such has not been shown to be the case here, where the Everharts will be forced to travel west no matter where (as between New Mexico or Colorado) the action is litigated.

It is the fourth factor in the analysis—the interstate judicial system's interest in

23

obtaining the most efficient resolution of controversies—that persuades the Court that this matter should be litigated in Colorado.[10]  For the reasons set forth above, the Court has found that Flight for Life does, in fact, have sufficient minimum contacts with the State of New Mexico such that the first half of the due process test is satisfied.  The Court also has found that New Mexico has a substantial interest in the matter and that the burden on Flight for Life in defending this action in New Mexico would not be disproportionate.  While it would not be unfair or unjust to make Flight for Life defend this action in New Mexico if Flight for Life were the only defendant contesting personal jurisdiction here, that is not the case. The Children's Hospital is also a defendant.  For the reasons set forth more fully below, the Court does not believe that The Children's Hospital has sufficient minimum contacts with New Mexico to allow this Court to assert personal jurisdiction over it.  However, as will be explained, the Court determines that the Everharts' claims are likely to have merit and should be allowed to proceed.  That being said, the Court concludes that the most efficient resolution will likely obtain if the Everharts are able to proceed against both Defendants together in a single forum.

---

[10]  Flight for Life's contacts with New Mexico, though determined by this Court sufficient to satisfy the "minimum contacts" test of the due process analysis, are nonetheless limited.  For that reason, Flight for Life does not bear a particularly heavy burden to show that the exercise of personal jurisdiction over it would be unreasonable.  See OMI Holdings, 149 F.3d at 1092 (sliding scale analysis).

**4. The Assertion of Personal Jurisdiction over The Children's Hospital**

Whereas the Court had little trouble finding, under the circumstances, that Flight for Life's contacts with the State of New Mexico are sufficient to support the assertion of personal jurisdiction over it, the same cannot be said for The Children's Hospital.  This is because it was largely Flight for Life's mission as a provider of medical transportation services and its ability and willingness to respond to a call for emergency medical care *by physically traveling to the patient* that persuaded the Court of its minimum contacts with New Mexico.  The Children's Hospital, however, does not exist to travel to and transport patients; instead, it serves to provide medical care to patients admitted to its facility in Denver, and that is the critical difference this Court sees between the contacts between the State of New Mexico and Flight for Life, and the contacts between the State of New Mexico and The Children's Hospital.  In short, the Everharts have not made a prima facie showing that The Children's Hospital purposefully directed its activities toward the State of New Mexico.

Unlike Flight for Life, the essence of the work of The Children's Hospital is not transportation.  Rather, The Children's Hospital exists to provide medical care to children in Denver.  As pertains to The Children's Hospital, the transportation of Charles Everhart was merely incidental to that defendant's primary service to him, which was his admission

to and treatment at its facility in Denver.[11]  Thus, in contrast to Flight for Life's presence in

New Mexico, The Children's Hospital's presence in New Mexico has not been shown to

have been more than an isolated event, and ancillary to the primary role The Children's

Hospital was to play.[12]  See DeVenzeio, 121 N.M. at 726;[13] cf. Russey, 837 F.Supp. at

1105.[14]

　　　　It is undisputed that it was a Children's Hospital employee who actually intubated

Charles and, therefore, committed one of the initial allegedly negligent acts in question.[15]

However, the commission of a tortious act, without more, is not enough to support the

────────────────

[11]　The Everharts occasionally refer to "the Defendants" as a unit. [See Doc. 39 at 11
("*Defendants* should have reasonably foreseen that their conduct might have an impact on New
Mexico leading to New Mexican jurisdiction[,]" "*Defendants* willingly entered into an
agreement for transferring care to a newborn that would likely need ongoing treatment[,]" and
"[E]mployees of *the Defendants* physically came to New Mexico to provide a service consistent
with their overall business.") (emphasis added)].  For purposes of the "minimum contacts"
analysis, however, the Court must separately analyze the alleged purposeful activities of Flight
for Life and those of The Children's Hospital.

[12]　That the Everharts were charged for Charles's ten-day stay at The Children's Hospital
further supports the conclusion that the hospital's primary service to him was the provision of
medical care in Denver. [See Doc. 39; Exh. 3].

[13]　"Rucker's primary service to the DeVenzeios was to provide legal services in
California on their behalf. These legal services were limited to pursuing rights and claims in
California. Rucker's letters and telephone calls to the DeVenzeios in New Mexico were ancillary
to this primary function."

[14]　"Because TCA's written correspondence is the nucleus of the alleged wrongful
conduct rather than just an ancillary contact with the forum, it was reasonable to have anticipated
being hailed into New Mexico court on claims based upon the letter."

[15]　As already explained, Charles was successfully intubated on the third try by
Children's Hospital employee Tiffany Garcia, after the first two attempts by Flight for Life nurse
Karen Steur failed. [See Doc. 39 at 5].

exercise of personal jurisdiction if it is not shown that a defendant "purposefully initiate[d] activities in this State.  This is true even though technically [the defendant] may have committed a tortious act in New Mexico."  Cronin, 129 N.M. at 527 (*citing* Tarango, 94 N.M. at 728).  Other than demonstrating that a Children's Hospital employee accompanied the Flight for Life crew that was dispatched to Albuquerque to fly Charles back to Denver, the Everharts have not shown how The Children's Hospital purposefully directed its activities toward residents of the State of New Mexico.  Unlike the hospital in Cronin, there has been no showing here of "an intentional, purposeful, and persistent transaction of business in New Mexico." Cronin, 129 N.M. at 523 (concluding that hospital intentionally initiated commercial activities in New Mexico by, among other things, placing advertisements in New Mexico telephone directories and producing television commercials that were viewed by New Mexico residents).  Nor does the sending of a bill to the Everharts' former home in New Mexico, seeking payment for services rendered to Charles in Denver, constitute the transaction of business for purposes of New Mexico's long-arm statute.[16]  See Tarango, 94 N.M. at 728.  Instead, at least with respect to The Children's Hospital, the record

_____

[16]  For purposes of the motion to dismiss, The Children's Hospital has conceded that the requirements of New Mexico's long-arm statute have been met inasmuch as one of its employees allegedly committed a tortious act within the state.  The Children's Hospital does not appear to have conceded to doing business in the state. [See Doc. 36 at 7 ("Plaintiffs' Complaint contains no allegations that The Children's Hospital . . . conducted business in New Mexico. Nonetheless [The Children's Hospital] concede[s] that the requirements of the New Mexico long-arm statute are met, *as Plaintiffs have alleged that employees of The Children's Hospital . . . committed tortious acts in New Mexico and Plaintiffs' claims arise from these acts.*") (emphasis added)].

reveals a situation where personal services, *i.e*, those rendered by a hospital, were required by an out-of state patient who needed to travel to the place where the services would be performed.  It has not been shown that the services were directed to impact upon the State of New Mexico as opposed to having been directed to Charles himself.  <u>See</u> <u>Gelineau</u>, 375 F.Supp. at 667.  For these reasons, the Court cannot say that The Children's Hospital purposefully directed its activities toward the State of New Mexico such that sufficient minimum contacts exist as would support the exercise of personal jurisdiction over this defendant.  Because the "minimum contacts" test has not been satisfied with respect to The Children's Hospital, the Court does not address the reasonableness of asserting personal jurisdiction over it.

### B. Motion to Transfer Venue

As an alternative to the dismissal of this action for lack of personal jurisdiction, Flight for Life and The Children's Hospital have moved, pursuant to 28 U.S.C. § 1631, to transfer venue to the District of Colorado. [Doc. 36 at 24-25].  The Everharts oppose transfer on grounds that (1) a transfer would not serve the best interests of justice, (2) Defendants purposefully availed themselves of the privilege of acting and conducting business in New Mexico, and (3) Defendants' contacts with the state are sufficient to establish jurisdiction over them. [Doc. 39 at 16].

Pursuant to 28 U.S.C. § 1631,

> [w]henever a civil action is filed in a court . . . and that court

> finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631.  The Tenth Circuit has held that "where the court determines that it lacks jurisdiction and the interests of justice require transfer rather than dismissal, '[t]he correct course . . . [is] to transfer the action pursuant to [§ 1631].'"  Trujillo, 465 F.3d at 1223 (quoting Ross v. Colorado Outward Bound Sch., Inc., 822 F.2d 1524, 1527 (10th Cir. 1987).

The Court determines that the interests of justice support the transfer of this matter to the District of Colorado.  See Trujillo, 465 F.3d at 1223 n.16.[17]  First, were the Court to dismiss, rather than transfer, the matter, the Everharts would likely encounter statute-of-limitations problems, since the alleged harm occurred in 2004 and medical malpractice actions in Colorado are subject to a two-year limitations period.  See Hurtado v. Brady, 165 P.3d 871, 874 (Colo.App. 2007) (noting two-year statute of limitations for medical malpractice claims, as set forth in C.R.S.A. § 13-80-102.5).  Next, the Everharts' claims are likely to have merit.  As explained more fully above, the Court concludes that the most efficient resolution of these potentially meritorious claims is likely to obtain if the Everharts

---

[17]  In Trujillo, the Tenth Circuit included the following as factors warranting transfer rather than dismissal: (1) that a new action would be time-barred, (2) that the claims likely have merit, and (3) that the original action was filed in good faith.

are able to proceed against both Flight for Life and The Children's Hospital in a single forum.  It is the same concern for efficiency that ultimately tipped the balance against asserting personal jurisdiction over Flight for Life, see infra Section II.A.3, that now supports transferring the matter to the District of Colorado, rather than dismissing it.  Finally, there is no allegation  or indication that this action was not filed in good faith.  For these reasons, the Court concludes that transfer to the District of Colorado is warranted here.

## III. CONCLUSION

As do so many others, this case presents a relatively straightforward legal question accompanied by a far more complex set of facts.  While the Court concludes that, under the particular circumstances, Flight for Life's contacts with the State of New Mexico are sufficient to justify the assertion of personal jurisdiction over it, the Court also concludes that it would not be reasonable to exercise that jurisdiction, since it would be far more efficient for this litigation to go forward as a single matter and in a single forum against both Flight for Life and The Children's Hospital.  As the Court concludes that it cannot exercise personal jurisdiction over The Children's Hospital, the interests of justice dictate that this matter be transferred to the United States District Court for the District of Colorado.

**IT IS, THEREFORE, ORDERED** that *Defendants The Children's Hospital's and Centura Health d/b/a/ St. Anthony Hospital and Flight for Life's Motion to Dismiss for Lack of Personal Jurisdiction or in the Alternative, Motion to Transfer Venue for Lack of Jurisdiction* [Doc. 36] is **GRANTED IN PART** and **DENIED IN PART;**

30

**IT IS FURTHER ORDERED** that motion is **DENIED** to the extent that Flight for Life and The Children's Hospital seek dismissal for lack of personal jurisdiction;

**IT IS FURTHER ORDERED** that motion is **GRANTED** to the extent that Flight for Life and The Children's Hospital seek to transfer venue;

**IT IS FURTHER ORDERED** that this matter be and hereby is **TRANSFERRED** to the United States District Court for the District of Colorado.

**SO ORDERED** this 21st day of March, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

31